IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JANA K., through her Parent TIM K.   :
of Hemet, CA,                     :
                         :    Civ. No. 13-CV-0115
          **Plaintiffs**   :
                         :
      **v.**               :
                         :
**ANNVILLE-CLEONA SCHOOL**  :
**DISTRICT,**                 :
                         :    **Judge Sylvia H. Rambo**
        **Defendant**   :

# M E M O R A N D U M

Presently before the court are cross-motions for judgment on the administrative record, appealing the decision of a Pennsylvania hearing officer wherein he found that the defendant school district failed to identify an emotionally disabled child as a student in need of special education and failed to provide her with a free appropriate public education, in violation of the Individuals with Disabilities Education Act, 20 U.S.C. § 1400, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.  To compensate the student for this deprivation, the hearing officer awarded her limited compensatory education in the amount of thirty minutes per week for the statutory period.

The school district challenges the hearing officer's decision in its entirety, arguing, *inter alia*, that the student's claims are time barred as a matter of law, that it did not violate its obligations to the student, and that an award of compensatory education is inappropriate under the facts of the case.  Alternatively, the district asks the court to affirm the hearing officer's decision to award thirty minutes of compensatory education per week for the statutory period.  The student asks the court to affirm the hearing officer's decision insofar as he found that the district denied her a free appropriate education, but to overrule his award of thirty

minutes of compensatory education and to instead grant full days compensatory education for the statutory period.

The court has thoroughly reviewed the administrative record, and for the reasons that follow, the court will grant the student's motion in its entirety and deny the district's motion in its entirety.

## I.        Background

### A.        Factual Background

Jana K. ("Jana" or "the student") attended school at Annville-Cleona School District ("the District") from kindergarten until she withdrew in 2011 at the end of her 8th grade year. (Hearing Transcript, pp. 10, 33-34 ("N.T. __").)  In the years prior to her withdrawal, Jana began exhibiting signs of emotional difficulty at school, including frequent unscheduled visits to the school nurse and guidance counselor, self-injurious threats and behavior, declining academic performance, and numerous unexcused absences.  Nevertheless, the District failed to identify and evaluate Jana as a student with an emotional disability in need of special education.

#### 1.        2009-2010 School Year (7th Grade)

During her 7th grade year, Jana's father began to notice signs of depression.  (*Id.* at 37.)  For example, Jana's eating and sleeping habits changed and she became more introverted.  (*Id.*)  Her grades also began to decline and, for the first time, she received poor and even failing grades.[1]  (*Id.* at 89; *see* P-1, pp. 1-3 of 3.)

---

[1]  The court notes, however, that Jana's grades were never exemplary.  For example, her reading and math grades slipped from a final grade of C+ in 4th grade to a D+ in 8th grade, with some fluctuations in the years between.  (*See* P-1, pp. 1-2 of 3.)

Throughout the school year, Jana visited the school nurse at an alarming rate. Indeed, the nurse's daily log reveals that Jana visited the school nurse at least 54 times with various complaints, including illness/injury, hunger, peer conflict, nervousness, and anxiety. (S-15, pp. 6-9 of 13; N.T. 372-73.) On numerous occasions, the nurse responded to Jana's complaints by providing "moral support" and/or by consulting with the guidance counselor (S-15, pp. 6-8 of 13), yet the nurse's overall perception was that Jana was hungry and needed food (N.T. 373, 379). These concerns prompted the District to contact Jana's father about the District's free-and-reduced lunch program (*id.* at 379), and, ultimately, to refer the matter to Children and Youth Services, although the investigation resulted in no further action (*id.* at 55, 261). At no time, however, did the District notify Jana's father of the frequency at which Jana visited the school nurse and necessitated "moral support."[2] (*See id.* at 46, 373.)

Jana's repeated visits to the school nurse were, at least to some extent, attributable to her tumultuous interactions with a certain peer group, which undisputably involved bullying. (*See, e.g.*, *id.* at 193, 198, 280, 375.) While this behavior was both "reciprocal and cyclical," Jana clearly perceived herself as a victim of the bullying and made several complaints in this regard to the nurse and school administrators.[3] (*See, e.g.*, *id.* at 193-200; S-15, p. 8 of 13.) In response, the

---

[2]  While the nurse's logs indicate that Jana frequently visited the nurse in prior school years, the nurse rarely noted providing "moral support" in response to Jana's earlier complaints. In fact, there were only two prior entries regarding moral or emotional support: one related to Jana seeing her mother for the first time in eight years and the other related to Jana reporting that she had no friends. (N.T. 9, 11.) The majority of Jana's earlier visits to the nurse related to self-care or illness/injury. (*See id.* at 9-13.)

[3]  The record reflects that, at times, Jana may have perceived herself as being bullied even when she was the victim of unintentional acts. For example, on one occasion, Jana reported that another

(continued...)

District provided counseling to Jana and the other members of this group.  (*See* N.T. 65-66, 108, 203-05, 277-81, 335-36, 375-76.)

Jana's emotional well-being continued to decline throughout the school year, culminating in an incident on April 27, 2010, wherein Jana cut herself in school with a metal instrument, which she then swallowed.  (*Id.* at 47, 52; S-15, p. 6 of 13.) She was immediately taken to the school nurse (S-15, p. 6 of 13), and the District instructed her father to take her to crisis intervention at a nearby hospital.  (N.T. 259.)  At the hospital, Jana was diagnosed with depression, for which her father was encouraged to pursue a psychiatric evaluation, counseling, and mobile therapy.  (*See* N.T. pp. 52-55; P-4.)  The District did not inquire as to the outcome of the hospital visit.  Less than one week later, the school nurse observed scratches "in various stages of healing" on Jana's arms "from [her] cat and cutting," and treated Jana by wrapping her arms in gauze.[4]  (S-15, p. 6 of 13.)  At the administrative hearing, the District attributed Jana's self-injurious behavior to an "epidemic" of cutting within the 7th grade class, presumably stemming from a popular young adult novel about cutting, and to the contagious nature of such behavior.  (N.T. 283-85.)  In response to this so-called epidemic, the District offered several group sessions to address the behavior.  (*Id.*)

---

[3] (...continued)
student hit her with a book bag, but the District's investigation, which included a review of a video of the incident and interviews with the other students involved, revealed that the other student had accidentally dropped the book bag when placing it into a locker above Jana's head.  (N.T. 109, 271-72.) On another occasion, Jana and her father reported that she had been assaulted in the school parking lot, but witnesses described the incident differently.  (*Id.* at 49, 69, 163, 274-75.)  Nevertheless, regardless of what actually occurred, Jana's perception of the incidents is not in dispute and was communicated to the District at the time.  (*See, e.g.*, N.T. 48-49, 69, 78, 109, 163, 197, 200, 271-75.)

[4]  The nurse had also noted scratches on Jana's left forearm on March 9, 2010.  (S-15, p. 7 of 13.)  At that time, Jana reported that she had kittens and denied any self-infliction.  (*Id.*)

Pursuant to crisis intervention's recommendation that Jana receive counseling, Jana's father contacted the behavioral health wraparound agency that had been providing services to his son[5] and requested services for Jana. (*Id*. at 48, 55.) On May 19, 2010, Dr. Nicholas Pappas, a licensed psychologist, evaluated Jana to determine her eligibility for the program. (*Id*. at 55; S-16.) Dr. Pappas concluded that Jana's symptoms were indicative of depression[6] and recommended that she receive wraparound services, including three hours of mobile therapy each week and a psychiatric evaluation. (S-16 at p. 4 of 4.) Dr. Pappas provided a copy of his report to Jana's father[7] (N.T. 61, 233-34, 321.) Although the District never received Dr. Pappas's report, it was nevertheless aware that Jana had begun receiving wraparound services because Jana's mobile therapist visited Jana in school, worked closely with Jana's guidance counselor, and attended meetings with Jana's father and the school administration. (*Id*. at 60, 196.)

## 2.  The 2010-2011 School Year (8th Grade)

Jana's difficulties continued to escalate throughout the 2010-2011 school year. Her visits to the school nurse began almost immediately upon her return to school and continued on a regular basis. (*See* S-15, pp. 1-6 of 13.) Indeed, Jana visited the nurse on 113 separate occasions that year, to which the nurse primarily responded by providing "moral support." (*Id.*) Despite the frequency of these visits,

---

[5] Jana's younger brother had also been evaluated by the District and found eligible for special education services in November 2007. His IEP included emotional support services and a positive behavior support plan. (N.T. 137-40, 346-47.)

[6] Specifically, Dr. Pappas diagnosed Jana with Adjustment Disorder with Depressed Mood and Depressive Disorder, Not Otherwise Specified and with Rule-Out Mathematics Disorder. (S-16, p. 4 of 4.) The term "rule out" indicates that a disorder is suspected and that additional evaluations are warranted because not enough information exists to confirm a diagnosis. (Doc. 6-2, p. 5 of 18, n.4.)

[7] Within the body of his report, under the subheading "School/Vocational," Dr. Pappas briefly noted that Jana did not have an individualized education program ("IEP"). (S-16, p. 2 of 4.)

no one in the District evaluated whether a pattern existed to Jana's visits or whether she sought out the nurse for some underlying reason.

Upon reevaluation for wraparound services in October, Dr. Pappas again diagnosed Jana with depression[8] and authorized the continuation of behavioral health services, including mobile therapy.  (S-17, p. 4 of 5.)  Dr. Pappas observed, *inter alia*, that Jana continued to be the victim of bullying and harassment at school, that her depression appeared to be worsening, and that she was experiencing difficulty with comprehension.  (*Id.*)  He recommended continuation of her wraparound services at an increased level of intensity and noted in his report that her father "is encouraged to pursue remedial assistance at school for her to address this issue."[9]  (*Id.*)  The District neither requested nor received the reevaluation report.

As noted by Dr. Pappas, Jana continued to associate with a negative peer group and experienced ongoing bullying throughout the school year.  In October, Jana's mobile therapist observed that, although the District "target[s] the bullies, . . . [the bullying] gets worse because [Jana] tattled."  (*Id.* at p. 3.) As part of their ongoing efforts to address the bullying, District personnel held meetings with Jana's father and mobile therapist, wherein the District suggested that Jana participate in peer mediation and student community groups, but Jana declined due to feelings of discomfort.  (*See, e.g.*, P-2; N.T. 63; S-17, p. 3 of 5.)  On occasion, Jana sought assistance from school administrators in ending these negative interactions, and, at one point, even requested and received four reciprocal "No

---

[8]   Specifically, Dr. Pappas diagnosed Jana with Adjustment Disorder with Depressed Mood and Depressive Disorder, Not Otherwise Specified and with Rule-Out Mathematics and Reading Disorders.  (S-17, p. 4.)

[9]   Within his report, Dr. Pappas again briefly noted that Jana did not have an IEP.  (S-17, p. 2 of 5.)

Contact" orders that prohibited her association with certain peers.  (N.T. 203-04; S-3; S-4; S-5; S-6.)  However, by the District's own account, the orders were ineffective. (N.T. 204-05.)  Indeed, in a June 2011 psychological evaluation, Dr. Pappas added post-traumatic stress disorder, which he attributed to in-school bullying, to his prior diagnoses.  (S-18, p. 5 of 6.)

    In addition to visiting the school nurse, Jana also frequently initiated meetings with the school guidance counselor.  (N.T. 157, 193.)  Jana discussed her difficulty maintaining positive peer relationships and, on several occasions, expressed thoughts of self-harm.[10]  (*Id.* at 174, 193-99, 210-11; S-18.)  Despite Jana's struggles, the guidance counselor neither established a formal schedule for meeting with Jana nor referred her for special education services because, in her view, Jana was intelligent and did not present behavioral problems.  (*Id.* at 210-11.) Likewise, the assistant principal, who was also aware of Jana's struggles, did not refer Jana for a special education evaluation because she did not believe Jana required placement in an emotional support classroom.  (N.T. 296.)

    Jana's emotional struggles became even more apparent, however, on January 13, 2011, when Jana verbalized a desire to commit suicide.  In response, the District informed Jana's mobile therapist of the event.  (*Id.* at 219-20.)

    Jana's academic performance continued to decline throughout the school year.  (P-6.)  In response, the District offered Jana several services to help improve her grades, including the use of a fifteen-minute flex period before lunch and a structured, forty-minute study hall during 9th period to provide her with opportunities to meet with teachers and complete assignments.  She was also offered

---

[10]  The guidance counselor destroyed all notes and records from her meetings with Jana. (N.T. 223.)

use of an after-school homework center, during which certified math and English teachers were available three days per week for tutoring at no cost.  (N.T. 302-03.) Nevertheless, by the third quarter, Jana was either failing or in danger of failing at least four classes, and each of her teachers noted that she was neglecting to complete assignments.  (S-13.)  She failed reading, which was in stark contrast to the A- she had received the previous school year and to the proficient and advanced scores she historically obtained in reading on standardized group achievement tests.  (*See* P-1; P-6; S-10; S-11.)  In the final quarter of the year, Jana failed science and received D's in reading and algebra.  (P-6; S-14.)

Jana's poor academic performance coincided with increasing absenteeism.  During the 2009-2010 school year, Jana had been absent two times. (P-1)  In contrast, during the 2010-2011 school year, she was absent seventeen times. (*Id.*)  To address Jana's frequent unexcused absences, the District fined Jana's father for truancy without first engaging in a truancy elimination plan, as recommended by the Pennsylvania Department of Education.  (P-3.)

At the end of the school year, Jana's father withdrew her from the District out of concern for her mental health and safety, and enrolled her in Commonwealth Connections Academy ("CCA"), a cyber charter school.  (N.T. 97-99.)  At CCA's request, Jana's father consented to have Jana evaluated for special education services.  On February 24, 2012, he received an initial evaluation report, which indicated, *inter alia*, that Jana suffered from depression (S-20) and that her scores on the Behavior Assessment System for Children and Child Depression Inventory showed clinically significant scores across multiple domains.  (N.T. 97-99; S-21 at 6 of 23.)  CCA concluded that she was eligible for specialized education

services as a student with Emotional Disturbance,[11] and implemented an individualized education program for Jana, which included, *inter alia*, organizational and executive functioning goals to increase her work completion and thirty minutes of counseling per week through computer video conferencing.  (N.T. 154-55; S-21.)

## B.    The Hearing Officer's Decision

Jana and her father, Tim K., (collectively "Plaintiffs") filed for a special education due process hearing on July 9, 2012, wherein they alleged that the District failed to provide Jana with a free appropriate public education ("FAPE") in violation of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, and Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794.  (ODR File No. 3355-1213-AS.)  On August 22, 2012, the District filed a motion to dismiss the complaint as untimely, or, in the alternative, to limit the scope of the claim.  In a pre-hearing order dated September 11, 2012, the Hearing Officer denied the District's request to dismiss the claim in its entirety, and determined that the statute of

---

[11]  The IDEA defines the disability category of Emotional Disturbance as follows:

(4)(I) Emotional disturbance means a condition exhibiting one or more of the following characteristics over a long period of time and to a marked degree that adversely affects a child's educational performance:

(A) An inability to learn that cannot be explained by intellectual, sensory, or health factors.

(B) An inability to build or maintain satisfactory interpersonal relationships with peers and teachers.

(C) Inappropriate types of behavior or feelings under normal circumstances.

(D) A general pervasive mood of unhappiness or depression.

(E) A tendency to develop physical symptoms or fears associated with personal or school problems.

34 C.F.R. § 300.8(c)(4)(i).

limitations prohibited claims arising prior to July 9, 2010 (two years before Plaintiffs requested a due process hearing).  (Doc. 7, p.7 of 60.)  However, because the District only asked him to preclude claims arising prior to February 24, 2010, the Hearing Officer limited the scope of claims to those occurring on or after February 24, 2010.[12]  (*Id.* at pp. 6-7 of 60.)

A due process hearing was conducted on September 21 and 24, 2012, and the administrative record closed on October 5, 2012.  In an October 19, 2012 final decision and order, the Hearing Officer determined, *inter alia*, that the District had violated its Child Find obligation to Jana by not evaluating her for a disability prior to the beginning of the statutory period.  His conclusion was based primarily upon his finding that there was ample evidence that Jana was exhibiting all of the symptoms and behaviors of Emotional Disturbance and that the District was well aware of the same.  (Doc. 6-2, p. 13 of 17.)  Although he found that the District should have suspected a disability as soon as the beginning of Jana's 7th grade year, the Hearing Officer determined that the IDEA's two-year statute of limitations permitted him only to consider violations that occurred after February 24, 2012, *i.e.*, the middle of Jana's 7th grade year.  (*Id.* p. 14 of 17.)  Accordingly, he concluded that the District had violated its Child Find duty no later than the beginning of the statutory period.

The Hearing Officer also concluded that the District's Child Find violation gave rise to a substantive violation of Jana's right to receive a FAPE, noting that, despite receiving various accommodations during the relevant academic years, Jana continued to suffer both socially and academically.  (*Id.* pp. 14-15 of 17.)

---

[12]  The Hearing Officer also found that neither the misrepresentation exception nor the withholding exception to the IDEA's statute of limitations applied.  (*See* Doc. 6-2, pp. 8-12 of 17.) However, the Hearing Officer's decision in this regard is not at issue in this appeal.

In short, the Hearing Officer found that Jana's need for additional educational support as she progressed through 7th and 8th grade indicated that those supports she did receive in the absence of an IED were inadequate.  As a remedy, the Hearing Officer awarded Jana thirty minutes of compensatory education for each week that school was in session between February 24, 2010 and the end of the 2010-2011 school year.  (*Id.* pp. 15-16 of 17.)

### C.   Procedural Background

On January 16, 2013, Plaintiffs filed a complaint in this court in the nature of an appeal, seeking reversal of the Hearing Officer's decision to award only thirty minutes of compensatory education per week and seeking instead an award of full days of compensatory education for the statutory period.  (Doc. 1.)  On March 27, 2013, the District filed its answer, which included a counterclaim that the Hearing Officer erred in concluding that the due process complaint was not time barred, in finding that the District violated its Child Find obligations and substantively denied Jana a FAPE, and in awarding compensatory education.  (Doc. 8.)  On December 20, 2013, Plaintiffs filed a motion for judgment on the administrative record (Doc. 21) and brief in support (Doc. 22).  That same day, Defendants filed a motion for judgment on the administrative record (Doc. 23), a statement of material facts (Doc. 24), and a brief in support (Doc. 25).  On January 21, 2014, the parties filed their respective briefs in opposition to the cross-motions. (Docs. 26 & 27.)  Thus, the motions are ripe for consideration.

**II.**         **Standard of Review**

"Judicial review in IDEA cases differs substantively from judicial review in other agency actions, in which the courts are generally confined to the administrative record and are held to a highly deferential standard of review." *Susan N. v. Wilson Sch. Dist.*, 70 F.3d 751, 757 (3d Cir. 1995).  In IDEA cases, district courts are to apply a "modified de novo" standard of review, under which factual findings from the administrative proceedings are to be accorded "due weight." *S.H. v. State-Operated Sch. Dist. of Newark*, 336 F.3d 260, 270 (3d Cir. 2003).  Pursuant to this standard, the hearing officer's factual findings are to be considered prima facie correct, but the district court may disagree with those findings if it explains its basis for doing so.  *See id.*; *Carlisle Area Sch. v. Scott P.*, 62 F.3d 520, 527 (3d Cir. 1995) ("[A]lthough the district courts must consider the administrative findings of fact, they are free to accept or reject them . . . .  But if the district court chooses to depart from the agency's ruling, it should provide some explanation for its departure.").  The court must, however, accept the hearing officer's credibility determinations "unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion or unless the record read in its entirety would compel a contrary conclusion." *S.H.*, 336 F.3d at 270 (quoting *Carlisle*, 62 F.3d at 529).

The district court's review of the hearing officer's application of legal standards and conclusions of law, on the other hand, is subject to plenary review. *Warren G. v. Cumberland Cnty. Sch. Dist.*, 190 F.3d 80, 83 (3d Cir. 1999).  However, the district court is not " to substitute its own notions of educational policy for those of local school authorities." *S.H.*, 336 F.3d at 270 (quoting *MM v. School Dist. of Greenville Cnty.*, 303 F.3d 523, 531 (4th Cir. 2002)).

Thus, pursuant to the above standards, the Hearing Officer's decisions regarding the application of the statute of limitations and the award of compensatory education are subject to plenary review as conclusions of law. *P.P. ex rel. Michael P. v. West Chester Area Sch. Dist.*, 585 F.3d 727, 735 (3d Cir. 2009). Whether the District fulfilled its Child Find and FAPE obligations are subject to clear error as questions of fact. *See id.* As the party challenging the administrative decision bears the burden of persuasion, *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 270 (3d Cir. 2012), Plaintiffs bear the burden with regard to the amount of compensatory education awarded and the District bears the burden with regard to the remaining issues on appeal.

## III.        Discussion[13]

Under the Individuals with Disabilities Education Act, states that receive federal educational assistance must establish "policies and procedures to ensure," among other things, that a "free appropriate public education" is available to disabled children.[14] *See* 20 U.S.C. § 1412(a)(1)(A); *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 244 (3d Cir. 2012). School districts may not ignore disabled children's needs nor may they await parental demands before providing special instruction.

---

[13]  Plaintiff brought the same FAPE claims under both the IDEA and Section 504. Consequently, the court's treatment of the claims under the IDEA is dispositive of the Section 504 claims. *See D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 249, 253 n.8 (3d Cir. 2012). For purposes of brevity, the court will frequently refer only to the IDEA, but its analysis applies to both statutes.

[14]  Similarly, Section 504 provides that recipients of federal funds must "provide a free appropriate public education to each qualified handicapped person who is in the recipient's jurisdiction, regardless of the nature or severity of the person's handicap." 34 C.F.R. § 104.33(a). Whereas the IDEA provides an affirmative duty to provide education, Section 504 prohibits discrimination against the disabled. *Grieco v. New Jersey Dep't of Educ.,* Civ. No. 06-cv-4077, 2007 WL 1876498, *4 (D.N.J., June 27, 2007) (citing *W.B. v. Matula*, 67 F.3d 484, 492-93 (3d Cir. 1995)). "There appear to be few differences, if any, between IDEA's affirmative duty and [Section] 504's negative prohibition." *Matula*, 67 F.3d at 492-93.

Rather, school districts must ensure that all children, "regardless of the severity of their disabilities, . . . who are in need of special education and related services, are identified, located, and evaluated . . . ." 20 U.S.C. § 1412(a)(3)(A). Once a child is identified, the school district must develop an "individualized education program" ("IEP") for the child that is uniquely tailored to his or her individual needs. While an IEP need not maximize the potential of the child, "it must provide meaningful access to education and confer some educational benefit upon the child for whom it is designed." *Ridgewood Bd. of Educ. v. N.E.*, 172 F.3d 238, 247 (3d Cir. 1999) (internal quotations and citations omitted); *Shore Reg'l High Sch. Bd. of Educ. v. P.S.*, 381 F.3d 194, 198 (3d Cir. 2004). It is well settled that, in this context, "education" extends beyond discrete academic skills and includes the social, emotional, and physical progress necessary to move the child toward meaningful independence and self-sufficiency consistent with the child's cognitive potential. *See, e.g.*, *M.C. v. Central Reg'l Sch. Dist.*, 81 F.3d 389, 393-94 (3d Cir. 1996). A disabled child who has not received an appropriate IEP is entitled to compensatory education. *Id*. at pp. 391-92.

In this case, the Hearing Officer found that the District neglected its duties by failing to identify Jana as a child in need of special education services and by offering her inadequate support. Consequently, the Hearing Officer determined that Jana was denied a FAPE and awarded her compensatory education to make up for the District's deficiencies. The District seeks a complete reversal of the Hearing Officer's decision, arguing that Plaintiffs' claims are barred by the statute of limitations and that the record contains compelling evidence that Jana received substantial support and was not denied a FAPE. The District asserts that the Hearing Officer's conclusions to the contrary are based upon errors of law and unsupported

findings of fact.  The District also challenges the Hearing Officer's award of compensatory education.

Plaintiffs disagree with the District and ask the court to affirm the Hearing Officer's decision in nearly all respects.  However, Plaintiffs urge the court to disregard the Hearing Officer's award of only limited compensatory education and to instead award full days compensatory education for the statutory period.

The court considers in turn whether the Hearing Officer committed error in finding that the District violated its Child Find obligation and denied Jana a FAPE, or whether the amount of compensatory education was inadequate.  Initially, however, the court must identify the time period to which Jana's claims apply under the statute of limitations.

### A.   Statute of Limitations[15]

Two subsections of 20 U.S.C. § 1415 guide the limitations period for IDEA claims.  Section 20 U.S.C. § 1415(f)(3)(C) provides that "[a] parent or agency shall request an impartial due process hearing within 2 years of the date the parent or agency knew or should have known about the alleged action that forms the basis of the complaint."  Section 1415(b)(6)(B), on the other hand, provides "[a]n opportunity for any party to present a complaint . . . which sets forth an alleged violation that occurred not more than 2 years before the date the parent or public agency knew or should have know about the alleged action that forms the basis of the complaint."  20 U.S.C. § 1415(b)(6)(B).

---

[15]  The IDEA's statute of limitations applies to Section 504 claims premised on IDEA obligations, such as those invoking a district's Child Find and FAPE duties.  *D.K.*, 696 F.3d at 244 (citing *P.P.*, 585 F.3d at 735-37 ("[W]e hold that the IDEA's two-year statute of limitations applies to claims made for education under § 504 of the Rehabilitation Act.")).  As such, the IDEA's statute of limitations applies to Plaintiffs' Section 504 claims in this case.

The District argues that the Hearing Officer made an error of law in determining that these sections, read together, create a single two-year filing limitation that bars an IDEA claim for relief as to any violation that occurred more than two years prior to the filing date of the due process complaint.[16]  Instead, the District contends that these subsections are distinct and mutually exclusive, with Section 1415(f)(3)(C) providing that a plaintiff has two years from the knew or should have known ("KOSHK") date to file a complaint, and Section 1415(b)(6)(B) providing that the complaint may not include violations occurring more than two years prior to the KOSHK date.  The District urges the court to render Plaintiffs' claims time barred as a matter of law because the complaint was filed more than two years after the date on which it proposes Jana's father knew or should have known of the cause of action.

In *I.H. ex rel D.S. v. Cumberland Valley School Distrist*, 842 F. Supp. 2d 762 (M.D. Pa. 2012), this court directly addressed the relationship between these two statutory provisions and found that they should be read to provide two distinct time limitations.  *Id*. at 773-74.  The court explained that Section 1415(f)(3)(C), "which controls the limitations period for filing an IDEA action, requires that a plaintiff must request their due process hearing within two years of the date that the parent or agency 'knew or should have known' about the alleged violations forming the basis of the [c]omplaint."  *Id*. at 774.  Because it was undisputed that the KOSHK date was June 8, 2010, and the complaint was filed on August 25, 2010, the court

---

[16]  Specifically, the Hearing Officer concluded that the scope of a plaintiff's claims in an IDEA case "is determined by subtracting two years from the date of the [due process] Complaint – unless either exception at 20 U.S.C. § 1415(f)(3)(D) applies."  (Doc. 7, p. 6 of 60.)  The due process complaint was filed on July 9, 2012.  Having found that neither exception to the statute of limitations applied, the Hearing Officer concluded that the IDEA's statute of limitations prohibited claims arising before July 9, 2010.  (*Id*.)

determined that the complaint was timely filed. *Id*. The court then moved to Section 1415(b)(6)(B), explaining that this section "provides a limitations period for the scope of the action, that is, which alleged violations or harms may be included in the complaint." *Id*. The court determined that Section 1415(b)(6)(B) limited the plaintiff's claims to those occurring after June 8, 2008, *i.e.*, two years before the KOSHK date, and, having found that neither of the IDEA's enumerated exceptions to this timeline applied, dismissed all earlier claims. *Id*. at 774-75.

Similarly, in *G.L. v. Ligonier Valley School District Authority*, Civ. No. 2:13-cv-00034, 2013 WL 6858963 (W.D. Pa. Dec. 30, 2013), the District Court for the Western District of Pennsylvania agreed with this court's reasoning in *I.H*. and held that these two sections are appropriately read as separate provisions, with one setting a limitations period for the filing of claims and the other temporally limiting the scope of the alleged violations. *Id*. at *3-4. Specifically, the court explained that, under Section 1415(f)(3)(C), the IDEA plaintiff has two years after the KOSHK date to file a complaint requesting a due process hearing, and under Section 1415(b)(6)(B), the plaintiff's claims may include allegations of IDEA violations occurring up to two years prior to the KOSHK date. *Id*. at *4. Thus, the first subsection is forward-looking, setting a time limit beyond the KOSHK date for a plaintiff to file a complaint, and, conversely, the latter subsection provides a "look-back" limit on liability, prohibiting the plaintiff from bringing allegations of an IDEA violation occurring more than two years prior to the KOSHK date. *Id*.

In the matter *sub judice*, the Hearing Officer explained that, although he had previously looked to the KOSHK date to determine whether claims were timely filed – a method that this court supported on appeal, *see I.H.*, 842 F. Supp. 2d at 773-74 – he had since reconsidered both the legal analysis of and procedure used to apply

the IDEA's statute of limitations and reached a different conclusion, *i.e.*, that the statute precludes claims arising more than two years before the filing of a due process complaint. (*See* Doc. 7, p. 5 of 60.)  In reaching this conclusion, the Hearing Officer relied on several cases that, pursuant to his interpretation, would essentially create an amalgam of Sections 1415(f)(3)(C) and (b)(6)(B). (*See* Doc. 7, pp. 5-6 of 60 (citing *Steven I. v. Central Bucks Sch. Dist.*, 618 F.3d 411 (3d Cir. 2010); *L.G. v. Wissahickon Sch. Dist.,* Civ. Nos. 06-0333, 06-3816, 2011 WL 13572 (E.D. Pa. Jan. 4, 2011); *School Dist. of Phila. v. Deborah A*., Civ. No. 08-2924, 2009 WL 778321 (E.D. Pa. Mar. 24, 2009); *Evan H. ex rel. Kosta H. v. Unionville-Chadds Ford Sch. Dist.*, Civ. No. 07-4990, 2008 WL 4791634 (E.D. Pa. Nov. 4, 2008).)  For example, in *Steven I.*, the Third Circuit noted that Section 1415(f)(3)(C) "broke new ground by providing for a two[-]year statute of limitations where there previously had been none," *Steven I.*, 618 F.3d. at 413, and held that the statute precluded claims arising more than two years before the filing of the due process complaint, *id.* at 417. However, the Hearing Officer's reliance is misplaced.  Each of these cases considered the applicability of the statute of limitations, which was created as part of the 2004 amendments to the IDEA, to compensatory education claims that were brought *after* the statute's effective date but arose from conduct that occurred *before* the statute's passage.  *See id.* at 412; *L.G.*, 2011 WL 13572, *7 n.5; *Deborah A.*, 2009 WL 778321 at *3-4; *Evan H*., 2008 WL 4791634 at *3.  Thus, the courts' holdings pertain only to whether the IDEA's statute of limitations retroactively bars claims that existed prior to July 1, 2005, and have no relevance to claims that arose from conduct occurring after the statute was enacted.

In this court's judgment, the plain language of the statute provides that plaintiffs have two years after the KOSHK date to file a due process complaint, and,

in that complaint, they may allege IDEA violations occurring within the two years preceding the KOSHK date.[17]  *G.L.*, 2013 WL 6858963 at *5; *I.H.*, 842 F. Supp. 2d at 773-74; *see* 20 U.S.C. §§ 1415(f)(3)(C) & (b)(6)(B).  Accordingly, under this "2+2" analysis, the scope of an IDEA due process claim could potentially total four years from the date the due process complaint is filed.  *G.L.*, 2013 WL 6858963 at *3.  Not only is the statutory language clear and unambiguous, this construction also properly gives independent meaning to both subsections, rather than combining them to stand for the same two-year limitation period, and renders the KOSHK language meaningful.  *See id*.  The court therefore concludes that the Hearing Officer's application of a two-year limitation period measured from the filing of the due process complaint was an error of law.

Having found that the Hearing Officer erred in his application of the statute of limitations, the court must determine: (1) the appropriate KOSHK date, (2) whether the complaint was timely filed; and, if it was, (3) the proper scope of Plaintiffs' claims.

The District argues that Jana's father knew or should of known of the existence of a Child Find claim against the District on May 26, 2010, when he received the psychological evaluation report completed by Dr. Pappas in connection with his request for wraparound services for Jana, and was therefore compelled to file a due process complaint within two years of that date.  Because Plaintiffs filed their complaint on July 9, 2012 – more than two years after receipt of the

---

[17]  However, the question of the proper statutory interpretation and application of 20 U.S.C. §§ 1415(f)(3)(C) and 1415(b)(6)(B) has yet to be decisively addressed by the Third Circuit. Recognizing that this issue of law is unsettled, the District Court for the Western District of Pennsylvania certified its order for an immediate petition for allowance to appeal to the Third Circuit under 28 U.S.C. § 1292(b), *see G.L.*, 2013 WL 6858963 at *6-7, and the matter now sits pending before the Third Circuit, *G.L. v. Ligonier Valley Sch. Dist. Auth.*, USCA No. 14-1387, 3d Cir.

psychological evaluation – the District urges the court to dismiss the complaint in its entirety.

The District's interpretation of the legal effect of the statute of limitations in this setting is contrary to both law and logic. Plaintiffs allege that "[Jana]'s rights were violated *every day* that school was in session from the start of the 2009-[20]10 school year through June 2011." (*See* Doc. 7, p. 1 of 5 (emphasis supplied).) Notwithstanding this allegation, the District asks the court to find that the statute requires a parent to file a due process complaint within two years of the date on which the parent *first* knew or should have known of a Child Find violation or forever relinquish *any* Child Find claim. This would lead to a preposterous result. While the parent's discovery of a Child Find violation may be the first point when he or she can bring a claim, it does not start a definitive limitations clock for the cause of actions; rather, the limitations clock runs for the individual violations. As in many other areas of law, a "continuing violation"[18] permits an injured party to assert a claim at the time of the most recent occurrence of a line of continuing violations. Therefore, because Plaintiffs allege that Jana was deprived of a FAPE each day that she went to school, the scope of claims in this case include, at a minimum, those occurring within the two years prior to the filing of the due process complaint.

Relevant case law supports this conclusion. In *Jefferson County Board of Education v. Lolita S.*, 977 F. Supp. 2d 1091 (N.D. Ala. 2013), the court considered whether the parent's Child Find claims arising more than two years prior to the filing of the due process complaint were barred by the IDEA's statute of

---

[18]   The court uses this phrase in the ordinary sense – the court does not use it as the doctrine frequently applied in other areas of law, where the doctrine operates to permit a plaintiff to recover for all acts that were part of the continuing violation. This point is made clear because of the Third Circuit's expressly stating that the doctrine is inapplicable to IDEA cases. *D.K.*, 696 F.3d at 233.

limitations. *Id*. at 1123. Although the court found that the parent knew or should have known of her cause of action no later than the fall of 2008, it held that only those claims occurring prior to October 2009 (two years before the due process complaint was filed) were barred. *Id.* Applying the District's theory, the court should have dismissed the complaint outright because the parent did not file for a due process hearing until more than two years after she first had notice of her claims. The *Lolita* court was correct in declining to do so.

Of course, this leads the court to an interesting question: In a case asserting continuing violations of the IDEA, how must the court apply a statute of limitations that relies on a definitive KOSHK date?

In a case asserting a continuing violation, even one that continues after the parent definitively knows that a school district is violating its Child Find obligations and/or that the child is deprived of a FAPE, each subsequent day in which the child is not identified and/or denied a FAPE is a new and actionable occurrence for which the parent can seek a remedy. Thus, while a KOSHK date may serve to define the temporal scope of the look-back, it does not operate to foreclose the child's ability to seek redress for a right of which she was deprived that occurred after the parent first knew or should have known of the deprivation. Accordingly, in a continuing violations scenario, if the complaint is filed within two years of the most recent occurrence, it is timely filed, regardless of when the parent first knew or should have known of the cause of action. Ordinarily, the scope of the claims will be limited to those occurring within two years of the date the complaint was filed.

However, the scope of the claims may be expanded further if the parent can show that he did not know and should not have known that the school district

was violating its Child Find obligations and/or depriving the child of a FAPE.[19]  *See*
*Jefferson*, 977 F. Supp. 2d at 1123.  If this is established, the look-back period under
20 U.S.C. § 1415(f)(3)(C) will permit claims occurring up to two years before the
KOSHK date rather than the date the due process complaint was filed.

The District argues that Jana's father knew or should have known of the
District's IDEA violations on May 26, 2010, when he received Dr. Pappas's report.
Because May 26, 2010 is more than two years before the filing of the due process
complaint on July 9, 2012, the District's proposed KOSHK date would limit the
scope of the claims to those occurring on or after July 9, 2010.  Jana's father
contends, however, that he did not know and should not have known of the District's
violations until February 24, 2012, when he received the initial evaluation from CCA
indicating that Jana was in need of special education services.  Because February 24,
2012 is within two years of filing the due process complaint, Plaintiffs' proposed
KOSHK date would render all claims regarding violations from February 24, 2010
onward as timely.

The court does not agree with the District's position that Jana's father
knew or should have known about his claims when he received Dr. Pappas's report.
The evaluation was performed solely for the purpose of identifying whether Jana was
eligible for wraparound services and did not purport to assess whether she was
eligible for services under the IDEA.  The report concluded that Jana was eligible for
mobile therapy, but made no specific recommendations as to special education,
related services, or other accommodations that should be provided in the school
setting.  (*See* S-16.)  Jana's father is not trained in special education, psychology, or

---

[19]  The scope of the claims will also expand if one of the statutory exceptions applies.  *See*
20 U.S.C. § 1415(f)(3)(D)(i)-(ii).  Neither exception is applicable here.

the IDEA, and therefore should not be deemed qualified to have known that the issues addressed in the report should have triggered the District's Child Find obligations. Thus, receipt of Dr. Pappas's report did not establish that Jana's father knew or should have known of his cause of action at that time.

The court will, however, accept Plaintiffs' proposed KOSHK date of February 24, 2012. The Hearing Officer found credible Jana's father's testimony that, prior to receiving the evaluation from CCA, he did not know that students who have emotional disturbances, but no disciplinary issues, could qualify for special education services. (*See* Doc. 6-2, p. 12 of 17 (citing N.T. 99, 132-33, 137-38, 141).) Absent "non-testimonial, extrinsic evidence" to the contrary, the court must accept the Hearing Officer's credibility determinations. *S.H.*, 336 F.3d at 270 (quoting *Carlisle*, 62 F.3d at 529). Moreover, the District has conceded that, in the event the court declined to dismiss the complaint in its entirety, the court should accept Plaintiff's proposed KOSHK date and limit the claims to those occurring on or after February 24, 2010. (*See* Doc. 25, p. 23.)

Accordingly, under 20 U.S.C. § 1415(b)(6)(B), the scope of Plaintiffs' claims may include IDEA violations occurring up to two years prior to the February 24, 2012 KOSHK date. Thus, despite a different interpretation and application of the IDEA's statute of limitations, the court affirms the Hearing Officer's determination regarding the proper scope of Plaintiffs' claims in this case.

## B.   Child Find

The court next considers whether the District failed to identify Jana as a student in need of a special education in violation of its Child Find obligations. The IDEA's Child Find provision requires states to ensure that "all children residing in the state who are disabled, regardless of the severity of their disability, and who are

in need of special education and related services are identified, located and evaluated." 20 U.S.C. § 1412(a)(3).  This provision places upon school districts "a continuing obligation . . . to identify and evaluate all students who are reasonably suspected of having a disability under the statutes." *P.P.*, 585 F.3d at 738.  A child who is suspected of having a qualifying disability must be identified "within a reasonable time after school officials are on notice of behavior that is likely to indicate a disability," *W.B.*, 67 F.3d at 501, even if the child is advancing from grade to grade.  *D.K.*, 696 F.3d at 249 (citing 34 C.F.R. § 300.111(c)(1); *accord Board of Educ. of Fayette Cnty. v. L.M.*, 478 F.3d 307, 313 (6th Cir. 2007); *Taylor v. Altoona Area Sch. Dist.*, 737 F. Supp. 2d 474, 484 (W.D. Pa. 2010)).  A school district's failure to timely evaluate a child who it should reasonably suspect of having a disability constitutes a procedural violation of the IDEA.  *D.K.*, 696 F.3d at 249.

In the matter *sub judice*, the court sees no reason to disagree with the Hearing Officer's conclusion that, by February 2010, the District should have evaluated Jana for a disability pursuant to the IDEA.  By that point, the District had ample reason to suspect that Jana suffered from a disability, particularly Emotional Disturbance, and yet never initiated an IDEA evaluation.  As the Hearing Officer explained in his decision:

> The transcript is replete with examples of the Student exhibiting all of [the] symptoms and behaviors [of Emotional Disturbance] (misperceiving certain events - i.e.[,] the book bag falling – as bullying, persistently poor peer relationships, an inability to form positive peer relationships, many trips to the nurse – not just for snacks but for 'moral support,' and a depressed mood).  It is well established that the District was aware of the same, and held meetings with the Parent . . . to discuss these problems.

(Doc. 6-2, p. 13 of 17.)  During this time, Jana's grades also declined, which "only heightened the District's obligation to determine if [her] emotional state was

24

affecting [her] educational performance." (*Id*. at p. 14 of 17.)  Although "the District had no obligation to propose an evaluation the moment that the symptoms were expressed, . . . [Jana] was symptomatic from the beginning of the 2009-2010 school year.  Under these circumstances, the District's failure to propose an evaluation is a Child Find violation." (*Id*.)

In its motion, the District contends that, in reaching his decision, the Hearing Officer improperly relied on the CCA evaluation insofar as it was conducted more than eight months after Jana withdrew from the District and therefore cannot be used to prove that Jana would have been diagnosed with Emotional Disturbance had she been evaluated during the relevant time period.  (Doc. 25, pp. 15-16.)  The District argues that "the law does not permit such a 'look back' to determine, after the fact, whether the [s]tudent should have been identified.  Rather, when evaluating whether a school district committed a '[C]hild [F]ind' violation, courts [should] look to what the '[d]istrict knew or had reason to know <u>at the time</u>.'" (*Id*. at p.16 (quoting *Daniel S. v. Council Rock Sch. Dist*., Civ. No. 06-3531, 2007 WL 3120014, *3 (E.D. Pa. Oct. 25, 2007)).)

To the extent the District takes exception with the Hearing Officer's reliance on the CCA evaluation itself, the court notes that the Hearing Officer never explicitly mentioned the evaluation in his analysis pertaining to Child Find.  The court therefore assumes that the District more distinctly takes issue with the Hearing Officer's assessing Jana's emotional and academic performance during the relevant time with knowledge of her eventual Emotional Disturbance diagnosis.  Taken in this context, the District insinuates that the Hearing Officer's post-hoc assessment is improper, as everything is colored with the lens of the diagnosis.  The District's argument is not convincing.  These types of proceedings are necessitated upon the

finding that the school district failed to timely discover a subsequently diagnosed disability. While hindsight can seldom be used in law to impute to a party something it should have known, here it is precisely the device used to adequately assess the student's needs and the school district's obligations at the relevant time. Thus, through this lens, the Hearing Officer properly concluded that, based on the myriad evidence, Jana exhibited "all of [the] symptoms and behaviors" set forth in the IDEA disability category of Emotional Disturbance during the 2009-2010 and 2010-2011 school years. (Doc. 6-2, p. 13 of 17.)

Moreover, the court finds no merit to the District's argument that it should not be held accountable for failing to identify Jana as a student in need of an IDEA evaluation because her father neither provided the District with her psychological evaluations from the wraparound agency nor requested that the District evaluate her for special education services.[20] Notwithstanding the fact that the District had constructive knowledge that Jana was receiving mobile therapy yet neglected to request copies of her evaluations, Jana's father's failures to share the evaluations or request an IDEA evaluation do not diminish the District's Child Find duties. Indeed, it was the District's nondelegable responsibility to propose an evaluation in light of the ample evidence of Jana's emotional issues and declining academic performance. As the Third Circuit has explained:

> Obviously the case against the school district will be stronger if the district actually knew of the educational deficiency or the parents had complained. But a child's

---

[20] The District contends that Jana's father's duty to request an evaluation for Jana was heightened because he had made such a request for his son in the past. While a parent's knowledge of the special education process is a factor to be considered in a Child Find claim (Doc. 6-2, pp. 11-12 of 17 (citing *D.K.*, 696 F.3d at *8)), Jana's father credibly testified that he did not know that students who have emotional disturbances, but no disciplinary issues, could qualify for special education services. (*Id.* at p. 12 of 17.) Because the court must defer to the credibility determinations of the Hearing Officer, the court will not disturb this finding. *See S.H.*, 336 F.3d at 270.

> entitlement to special education should not depend upon the vigilance of the parents (who may not be sufficiently sophisticated to comprehend the problem) . . . . Rather, it is the responsibility of the child's teachers, therapists, and administrators . . . to ascertain the child's educational needs, respond to deficiencies, and place him or her accordingly.

*M.C.*, 81 F.3d at 397.

The court is likewise unpersuaded by the District's argument that, even if Jana had been diagnosed with Emotional Disturbance while still enrolled in the District, she nevertheless may not have qualified for special education services because Plaintiffs failed to prove that her disability adversely affected her overall educational progress, particularly her academic performance.  (Doc. 25, pp. 17-18.) As the Hearing Officer observed, during the 2009-2010 school year, Jana's grades began to decline contemporaneously with her being bullied, exhibiting signs of depression, and frequently visiting the nurse for "moral support."  During this time period, Jana also appeared at school with scratches on her arms from "cutting" and even cut herself while in school.  Symptoms of Jana's worsening emotional condition persisted into the 2010-2011 school year, accompanied by an even more precipitous drop in her grades and threats of self-harm and suicide.  Thus, the evidence as a whole "paints a picture of a capable but underperforming child" (Doc. 6-2, p. 14 of 17), and demonstrates a connection between Jana's emotional condition and her academic performance.  Her under performance provided yet another signal that should have triggered the District's Child Find obligations.[21]  (*See id.*)

---

[21]  The District also argues that Jana's absences "did not present a cause for concern." (Doc. 25, p. 14 of 31.)  However, while the Hearing Officer took note of Jana's increase in unexcused absences during her 2010-2011 school year (Doc. 6-2, p. 6 of 17 n.6), he did not base his Child Find decision, even in part, on those absences.  (*See id.* at pp. 12-14 of 17.)

The court appreciates, however, that the District took measures to address Jana's needs. A school district is not obligated to conduct a formal evaluation of every struggling student and it may be prudent to offer other interventions before rushing to a special education identification. *See D.K.*, 696 F.3d at 249. However, the court is troubled by the fact that, despite its ongoing recognition of Jana's proliferating emotional, intellectual, and behavioral needs, the District failed to request reports or updates from her mobile therapist and failed to consider initiating an IDEA evaluation. Further, the District neglected to draft a formal plan for Jana to routinely receive counseling services through the school despite her need for such counseling being readily apparent. Not only did she frequently initiate visits with the guidance counselor and stop by the nurse's office for moral support, she also engaged in self-injurious behavior, expressed thoughts of self-harm to the guidance counselor, and verbalized, in school, a desire to commit suicide – all while the school knew she was being bullied and her grades were declining. Thus, while a school "need not rush to judgment or immediately evaluate every student," *id.* at 252, the court cannot reconcile Jana's glaring needs with the school district's failure to identify and evaluate her as a child potentially in need of special education.

In conclusion, the court has little trouble affirming the Hearing Officer's decision insofar as he found that the District violated its Child Find obligations to Jana. While no piece of evidence alone conclusively demonstrated her need for an evaluation, the mosaic of evidence in this case clearly portrays a student who was in need of a special education evaluation by – at the latest – the beginning of the statutory period. The District's failure to provide as much constituted a Child Find violation.

C.    **FAPE**

The next issue is whether the District's Child Find violation amounted to a substantive denial of a FAPE.  As stated above, a school district's failure to comply with Child Find may constitute a procedural violation of the IDEA.  However, while it is important for a district to comply with the IDEA's procedural requirements, compliance is not the goal in and of itself.  *Ridley*, 680 F.3d at 274 (quoting *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 565 (3d Cir. 2010)).  Rather, compliance with Child Find's requirements is important because of the impact the requirements may have on the student's and parents' substantive rights.  *Id.* "Accordingly, '[a] procedural violation is actionable under the IDEA only if it results in a loss of educational opportunity for the student, seriously deprives parents of their participation rights, or causes a deprivation of educational benefits." *Id.* (quoting *D.S.*, 602 F.3d at 565.)

The court will affirm the Hearing Officer's conclusion that the District's procedural violation of Child Find affected Jana's substantive rights.  Indeed, the District's failure to evaluate Jana for special education deprived her of the opportunity to benefit from an IEP.  While she did, in fact, receive specialized services and supports from the District throughout the 2009-2010 and 2010-2011 school years, as the District emphasizes, the relevant consideration is that her emotional well-being and academic performance were clearly declining.  Effective supports were clearly not provided.   The informal, unsupervised, and patchwork supports that the District offered were uncoordinated and intermittent, and largely depended on Jana taking the initiative to take advantage of them.  Indeed, these supports lacked the accountability, measurable goals, and progress monitoring that an IEP would have provided.  While the District argues that "Jana received a greater

level of service than the typical special education student with Emotional Disturbance" would have received (Doc. 25, p. 22 of 31), Jana's continual decline throughout the two school years at issue clearly shows that the services provided were ineffective to halt or reverse Jana's educational decline. Certainly, it is impossible to know whether Jana's circumstances would have been significantly better had the District identified her as an emotionally disabled student and provided her with an IEP. It is not the province of the court, however, to predict what might have been. Jana was entitled to a timely evaluation and that never occurred. As a result, she did not receive an IEP and suffered both emotionally and academically.

The District posits that Jana's father would have withheld his consent to an IDEA evaluation, and thus insinuates that it should not be held accountable for failing to provide Jana with an IEP that her father would have prevented it from implementing.[22] Such an argument, however, cannot be based on mere conjecture. Even if the District suspected that Jana's father would refuse an IDEA evaluation, it would have been prudent and consistent with the District's responsibility had it identified Jana as a student with a potential disability and sought her father's permission to conduct an evaluation. Simply stated, Jana's father's response would in no way alter the District's legal obligations to Jana under the IDEA. It was the

---

[22] In making this assumption, the District refers to Jana's father's declining to grant permission for her to participate in a student assistance program and to a December 2010 meeting, wherein the District apparently suggested that Jana be referred for a psychological or psychiatric evaluation. In response, Jana's father allegedly threatened to sue the District if any such evaluation occurred. The District argues that the evidence in this regard is "uncontroverted." (Doc. 25, pp. 26-27.) However, Jana's father testified that the District never suggested an evaluation and that he never threatened to sue the District. (N.T. 111-12.) Moreover, the District has offered no documentation to show that such an offer was made and the notes of Jana's mobile therapist regarding the meeting do not reflect that the District suggested such an evaluation. (*See* P-2.) Indeed, the Hearing Officer made no findings of fact that the District offered to evaluate Jana during this meeting or at any point during the relevant time period, or that any inference could be made from any purported informal suggestion of an evaluation. (*See generally* Doc. 6-2.)

District's obligation to put all other considerations aside and to notify Jana's father in writing that it believed an evaluation was needed, provide a written description of the proposed evaluation, seek consent, and provide a procedural safeguards notice in accordance with 34 C.F.R. §§ 300.300, 300.503, and 300.504.

Accordingly, for the reasons stated above, the court affirms the Hearing Officer's conclusion that the District deprived Jana of a FAPE during the statutory period.  For that deprivation, Jana is entitled to compensatory education.

### D.    **Compensatory Education**

To compensate Jana for the District's failure to provide a FAPE, the Hearing Officer awarded compensatory education in the amount of thirty minutes per week.  Arguing that neither reasoning nor evidence support this half-hour per week calculation, Plaintiffs urge the court to reverse the Hearing Officer's award and to instead grant Jana full days compensatory education.  Because the court finds that the Hearing Officer's award would clearly fail to put Jana in the position she would have been in had she been provided a FAPE, the court will decline to affirm his decision in this regard.

### 1.    **Standard for Determining the Amount of Compensatory Education to be Awarded**

In support of their argument for full days compensatory education, Plaintiffs cite to cases standing for the proposition that courts should not attempt to parse out the exact amount of hours a child was deprived of a FAPE and should instead award full days of compensatory education for the relevant time period.  *See Damian J. v. School Dist. of Phila.*, Civ. No. 06-3866, 2008 WL 191176, *7 n.16 (E.D. Pa. Jan. 22, 2008); *Keystone Cent. Sch. Dist. v. E.E. ex rel. H.E.*, 438 F. Supp. 2d 519, 526 (M.D. Pa. 2006).  Essentially, Plaintiffs ask the court to adopt a presumption that each day without a FAPE entitles the student to one day of

compensatory education – a standard they argue was embraced by the Third Circuit.

In *M.C. v. Central Regional School District*, 81 F.3d 389 (3d Cir. 1996), the Third Circuit held that "a disabled child is entitled to compensatory education for a period equal to the period of deprivation, but excluding the time reasonably required for the school district to rectify the problem."[23]  *Id.* at  397.  Some courts have interpreted this language as requiring full days compensatory education for the period of deprivation, as Plaintiffs suggest.  *See, e.g.*, *Central Sch. Dist. v. K.C.*, Civ. No. 11-6869, 2013 WL 3367484, *11 (E.D. Pa. July 3, 2013) (referring to this standard as an "hour-for-hour replacement for the period of deprivation" or a "cookie-cutter approach"); *Reid ex rel.Reid v. District of Columbia*, 401 F.3d 516, 523 (D.D.C. 2005) (finding that the Third Circuit's "cookie-cutter approach" presumes that "each hour without a FAPE entitles the student to one hour of compensatory education"); *B.C. ex rel. J.C. v. Penn Manor Sch. Dist.*, 906 A.2d 642, 649 (Pa. Commw. Ct. 2006) (stating that "the Third Circuit awards compensatory education solely on the basis of the actual time a student was deprived of a FAPE, without further analysis").  Indeed, numerous courts within this circuit have merely cited the *M.C.* court's language and awarded full days compensatory education for the period of deprivation with little, if any, additional consideration.  *See, e.g.*, *Damian J.*, 2008 WL 191176 at *7 (declining to parse out the exact number of hours the student was not benefitted by an IEP and instead awarding full days compensatory education); *Lauren P. ex rel. David P. v. Wissahickon Sch. Dist.*, Civ. No. 05-5196, 2007 WL 1810671, *4 (E.D. Pa. Jun. 20,

---

[23]  In its decision, the Third Circuit declined to allocate the appropriate award to compensate the student and instead remanded the case for further proceedings consistent with its opinion, thus leaving its language open to different interpretations. *See M.C.*, 81 F.3d at 397 ("On remand, the district court should determine when the Central Regional knew or should have known that J.C.'s IEP was inappropriate or that he was not receiving more than a *de minimis* educational benefit; it should also define the reasonable time within which the district should have done something about it. Compensatory education should accrue from that point forward.")

2007) (awarding full days compensatory education for period of deprivation without other consideration), *rev'd on other grounds* 310 F. App'x 552 (3d Cir. 2009); *Keystone*, 438 F. Supp. 2d at 525-26 (finding that an award of compensatory education equals the amount of hours contained within the representative school years); *East Penn Sch. Dist. v. Scott B.*, Civ. No. 97-1989, 1999 WL 178363, *8-9 (E.D. Pa. 1999) (awarding full days compensatory education for period student did not have assistive technology less a reasonable amount of time for the district to have procured a suitable laptop and designed a functional plan for the implementation of the technology).  However, other courts have interpreted this language as requiring a more particularized award calculated based upon the quantity of services improperly withheld during the period of deprivation, less the reasonable amount of time in which the school district should have addressed the deficiency.  *See, e.g.*, *Breanne C. v. Southern York Cnty. Sch. Dist.*, 732 F. Supp. 2d 474, 487-88 (M.D. Pa. 2010) (affirming appeals panel's award of one hour of compensatory education per day for the period of deprivation based on a prior IEP under which the student had been making progress); *Neena S. ex rel. Robert S. v. School Dist. of Phila.*, Civ. No. 05-5404, 2008 WL 5273546, *7 (E.D. Pa. Dec. 19, 2008) (awarding one hour per day for each subject area in which the student lacked meaningful progress during the period of deprivation); *Heather D. v. Northampton Area Sch. Dist.*, 511 F. Supp. 2d 549, 557-59 (E.D. Pa. 2007) (affirming appeals panel's award of ten hours per week for period of deprivation based on recommendation of neuropsychologist). Consequently, these contrasting interpretations have led to a conflict within the Third Circuit.

The conflict arises, however, because those courts interpreting the decision as blanketly requiring an award of full days education have neglected to

consider the very nature of this type of damages award. "Compensatory education for a period equal to the period of deprivation" does not mean specialized education for a full day. *See M.C.*, 81 F.3d at 397. Rather, "compensatory," by its very definition, requires the court to identify the time period during which the child was deprived of appropriate education and assess the difference between the educational services the child should have received during that time period and the services the child did receive. That difference is the compensatory education, and the court must award its full value. For example, where a child should have received three hours of specialized education for two years, but instead received only one hour per day for two years, compensatory education would net an award of two hours per day for two years.[24] Such an award serves to compensate the child for the specialized education she missed due to the school district's failure to provide a FAPE, and is consistent with the Third Circuit's stated desire to "harmoniz[e] the interests of the child, who is entitled to a free appropriate education under [the] IDEA, with those of the school district, to whom special education and compensatory education is quite costly." *Id.*

Other courts that have adopted this type of individualized approach to calculating a compensatory education award have focused on the equitable and discretionary nature of the award. *See, e.g.*, *Reid*, 401 F.3d at 518, 523. In rejecting what it considered to be the Third Circuit's "mechanical," "hour-for-hour" approach, the D.C. Court of Appeals explained as follows:

> "[C]ompensatory education is not a contractual remedy, but an equitable remedy, part of the court's resources in crafting 'appropriate relief.'" More specifically, as the Fourth Circuit has explained, "[c]ompensatory education involves discretionary, prospective, injunctive relief

---

[24] As the court will discuss *infra*, in some cases, the evidence may show that more or less compensatory education is necessary to place the child in the position he or she would have occupied but for the school district's failures.

> crafted by a court to remedy what might be termed an
> educational deficit created by an educational agency's
> failure over a given period of time to provide a FAPE to a
> student." . . . [An] hour-for-hour formula in effect treats
> compensatory education as a form of damages – a charge
> on school districts equal to expenditures they should have
> made previously. Yet "[t]he essence of equity
> jurisdiction' is 'to do equity and to mould each degree to
> the necessities of the particular case. Flexibility rather
> than rigidity has distinguished it."

*Id.* at 523-24 (internal citations omitted). Guided by the IDEA's aim to guarantee disabled students "specialized education and related services designed to meet their unique needs," *Id.* at 524 (quoting 20 U.S.C. § 1400(d)(1)(A) (emphasis supplied)), the court reasoned that "it would be highly incongruous if this qualitative focus on individual needs gave way to mechanical hour-counting when past rather than current violations of the FAPE standard were at issue. Accordingly, just as IEPs focus on disabled students' individual needs, so must awards compensating past violations rely on individual assessments." *Id.* The *Reid* court noted that:

> unlike [a] one-for-one standard, this flexible approach will
> produce different results in different cases depending on
> the child's needs. Some students may require only short,
> intensive compensatory programs targeted at specific
> problems or deficiencies. Others may need extended
> programs, perhaps even exceeding hour-for-hour
> replacement of time spent without [a] FAPE.

*Id.* In every case, "the inquiry must be fact-specific and, to accomplish the IDEA's purposes, the ultimate award must be reasonably calculated to provide the educational benefits that likely would have accrued from special education services the school district should have supplied in the first place." *Id.* In conclusion, the court held that the disabled student is "not entitled . . . to an amount of [compensatory education] predetermined by a cookie-cutter formula, but rather to an informed and reasonable exercise of discretion regarding what services he needs to elevate him to the position he would have occupied absent the school district's failures." *Id.* at 527.

Similarly, the Ninth Circuit rejected the plaintiffs' argument that the student was "ipso factor" entitled to an amount of compensatory education equal to the time of deprivation "without any further analysis." *Parents of Student W. v. Puyallup Sch. Dist., No. 3*, 31 F.3d 1489, 1497 (9th Cir. 1994). Rather, the court concluded that "[t]here is no obligation to provide a day-for-day compensation for time missed. Appropriate relief is relief designed to ensure that the student is appropriately educated within the meaning of the IDEA." *Id*. Focusing on the equitable nature of compensatory education, the court instructed district courts to apply a fact-specific analysis focusing on both parties' conduct and what the student had or had not achieved. *Id*.

In *B.C. ex rel. J.C. v. Penn Manor School District*, 906 A.2d 642 (Pa. Commw. Ct. 2006), the Commonwealth Court of Pennsylvania was persuaded by the Ninth and D.C. Circuits' standard "as it tailors the equitable award of compensatory education to the particular student's needs." *Id*. at 650. The court held that, where a student is denied a FAPE and an award of compensatory education is appropriate, "the student is entitled to an amount of compensatory education reasonably calculated to bring him to the position that he would have occupied but for the school district's failure to provide a FAPE." *Id*. at 650-51.

This court is similarly persuaded by the courts' applying an individually tailored approach to compensatory education and concludes that, while "a child is entitled to compensatory education for the period equal to the period of education, but excluding the time reasonably required for the school district to rectify the problem," the *amount* of compensatory education to be awarded for each school day during the period of deprivation should be reasonably calculated to provide the educational benefits the child should have received in the first place. Thus, the  appropriate and

reasonable level of reimbursement will match the quantity of services improperly withheld throughout that time period, unless the evidence shows that the child requires more or less education to be placed in the position he or she would have occupied absent the school district's deficiencies.  The court is confident that such a standard for awarding compensatory education achieves the IDEA's aim to provide disabled students with specialized education and services and that it is consistent with the decisions of the D.C. and Ninth Circuits, as well as the Commonwealth Court of Pennsylvania.  The court is similarly confident that its holding is in accordance with Third Circuit precedent.  As the Third Circuit has articulated, compensatory education is an equitable remedy designed to replace the educational services a disabled child should have received pursuant to a FAPE, *see Lester H. v. Gilhool*, 916 F.2d 865, 873 (3d Cir. 1990), and must therefore "aim to place [the] disabled [student] in the same position [she] would have occupied but for the school district's violations of [the] IDEA," *Ferren C. v. School Dist. of Phila.*, 612 F.3d 712, 717 (3d Cir. 2010).  A simply mechanical one-for-one approach would fall short of achieving this goal.

### 2.  <u>Compensatory Education Award</u>

It is evident that the Hearing Officer failed to fashion his compensatory education award to put Jana in the educational position she would have occupied but for the District's violations.  Although he recognized that this is the goal of such an award, the Hearing Officer noted that Plaintiffs failed to present evidence as to how many hours of specialized services Jana should have received.  In lieu of "better evidence," the Hearing Officer looked to Jana's CCP IEP for guidance, which provided, *inter alia*, that Jana receive thirty minutes of online counseling per week to address her diagnosis of Emotional Disturbance.  (Doc. 6-2, pp. 15-16 of 17.)  Because counseling was the only service within the IEP directly applicable to her

diagnosis, the Hearing Officer awarded Jana the equivalent retrospective relief for the District's denial of a FAPE, *i.e.*, thirty minutes of counseling per week for the statutory period, and disregarded the services she was receiving to target her "organizational and executive functioning issues."[25]  (*See id.* at p. 16 of 17.)

However, it is readily apparent that the amount of counseling Jana requires at CCA, a cyber charter school, cannot be equated to that which she would have required in the District, a brick and mortar school.  Indeed, the Hearing Officer stated that he was in no way "suggest[ing] that the services provided through the cyber charter school's IEP would have been appropriate in a traditional school setting." (*Id.* at p. 15 of 17.)  Jana's primary emotional issues while attending school in the District stemmed from negative peer interactions and bullying, which dissipated when she started attending school at home.  Consequently, Jana's enrollment in CCA likely presented fewer emotional and behavioral challenges than did her program in the District, and, therefore, a single thirty-minute counseling session per week would not have provided her with the amount and type of support she required in the public school setting.  To be sure, while enrolled in the District, Jana proactively sought and received counseling on a regular, albeit unscheduled, basis from both the guidance counselor and the school nurse, and thus received a roughly comparable service that proved to be inadequate at the time.

Moreover, the court is perplexed as to why the Hearing Officer, in a one sentence ipse dixit, determined that the only relevant portion of the CCA IEP was that which directly addressed Jana's Emotional Disturbance diagnosis.  Certainly, it was

---

[25]  The Hearing Officer stated that the award would ordinarily be reduced by the amount of time that it could have taken for the District to reasonably identify and address the disability, but concluded that, because Jana started signaling the need for an evaluation at the start of the 2009-2010 school year, by late February of 2010, the District should have responded to her needs.  (*See* Doc. 6-2, p. 16 of 17.)

this diagnosis which qualified Jana for an IEP.  However, the impact of such a diagnosis is often widespread, as it was here.  By definition, Emotional Disturbance "adversely affects a child's educational performance" and can manifest itself in a variety of ways, including "[a]n inability to learn that cannot be explained by intellectual, sensory, or health factors."  34 C.F.R.§ 300.8(c)(4)(I).  The Hearing Officer explicitly found that Jana was a "capable but underperforming child . . . [whose] academic underperformance only heightened the District's obligation to determine if [her] emotional state was affecting educational performance."  (Doc. 6-2, p. 14 of 17.)  As such, "[s]ome assessment to determine whether [Jana] needed individualized specially designed instruction to help [her] overcome social deficits was in order."  (*Id.*)  Concluding that the services Jana did receive were "ineffective," the Hearing Officer found that Jana "suffered *both* socially and academically."  (*Id.* (emphasis supplied).)  Notwithstanding his own findings, the Hearing Officer disregarded the impact of Jana's disability on her entire education when calculating his award.  As the Hearing Officer initially recognized, however, the District's failure to provide Jana with appropriate and effective emotional, behavioral, social, and executive functioning supports negatively affected her ability to fully access nearly every aspect of her education.   Accordingly, the court concludes that the Hearing Officer's award of a mere thirty-minutes of compensatory education per week for nearly two years of educational decline was both arbitrary and inadequate, and will not affirm the Hearing Officer's decision in this regard.

The question thus becomes how much compensatory education Jana is owed.  As stated, an award of compensatory education should be based on the amount of services necessary to provide the same qualitative educational benefit the student would have received during the period of deprivation absent the school district's

deficiencies.  However, in a case such as this, where the school district's failure to provide specialized services permeated the student's education and resulted in a progressive and widespread decline in her academic and emotional well-being, the court is reminded that, in some instances, "parsing out the exact amount of hours [a student] was not benefitted by [a] FAPE" "would place an arduous and near impossible task upon the administrative bodies." *See Keystone*, 438 F. Supp. 2d at 525-26.  As such, the court is persuaded by those courts which have found that an award of full days compensatory education may be an appropriate remedy when the overall effect of a district's failure to provide a FAPE resulted in a pervasive loss of education benefit to the student, and finds that the record supports such a remedy here.  *See, e.g.*, *Tyler W. ex rel. Daniel W. v. Upper Perkiomen Sch. Dist.*, 963 F. Supp. 2d 427, 438-39 (E.D. Pa. Aug. 6, 2013) (finding that when student makes little to no academic progress, it indicates that the district's failure to address his needs pervaded his entire school day and warrants the award of full days compensatory education); *Penn Trafford Sch. Dist. v. C.F. ex rel. M.F.*, Civ. No. 04-1395, 2006 WL 840334, *9 (W.D. Pa. Mar. 28, 2006) (awarding full days compensatory education for period of deprivation because IEP "failed to confer any meaningful educational benefit"); *M.L./Marple Newtown Sch. Dist.*, ODR No. 3225-11-12-KE, at 20 (Dec. 1, 2012) (concluding that the record supports full days compensatory education because the student lacked "meaningful progress in all subject areas due to behaviors interfering with learning, which also impacted Student's growth in social skills"); *L.B./Colonial Sch. Dist.*, ODR No. 1631-1011AS, at 18-19 (Nov. 12, 2011) (awarding full days compensatory education because District failed to timely evaluate the student for emotional and behavioral issue and thereafter offered inappropriate programs that failed to address the student's needs); *But see Heather D.*, 511 F. Supp.

2d at 557 (stating that an award of a full year of compensatory education for each year at issue was not warranted because the student's needs did not pervade her entire school day).

In awarding full days compensatory education, the court does not suggest that the District failed to provide any educational benefit whatsoever to Jana during the relevant time period, as the District contends such an award reflects. However, while the court endeavors to identify the difference between the education services the student received and those which she should have received, in a situation such as this, where the overall effect of the school district's deficiencies resulted in a widespread loss of educational benefit for the student, it would be futile to attempt to parse out the precise number of hours that the student was denied a FAPE. Thus, to err on the side of awarding too much compensatory education rather than too little, the court will award full days compensatory education for the statutory period.[26]

## IV.        **Conclusion**

For the foregoing reasons, the court will affirm the Hearing Officer's decision insofar as he found that the District breached its Child Find obligation by failing to identify Jana as a student with a disability and in need of special education.

---

[26] Several courts within this circuit have held "that the IDEA's statute of limitations does not apply to limit the permissible period of compensatory educational awards." *Central Sch. Dist.,* 2013 WL 3367484 at *12 n.6; *Penn Trafford*, 2006 WL 840334 at *5-6 ("While the right to reimbursement belongs to the parents, the right to compensatory education belongs to the disabled child and thus it is appropriate that an equitable period of limitations apply to enforcement of the parents' rights, but not to enforcement of the child's rights."); *Amanda A. v. Coatsville Area Sch. Dist.*, Civ. No. 04-4184, 2005 WL 426090, * 6 (E.D. Pa. Feb. 23, 2005) ("[T]here is no limitations period, whether equitable or legal, on a disabled child's claim for compensatory education pursuant to the IDEA."). However, because Plaintiffs did not ask the court to extend the period to which the compensatory education award should apply, the court will decline to do so *sua sponte*.

The court will also affirm the Hearing Officer's finding that the District's Child Find violation resulted in a substantive denial of a FAPE for which compensatory education is owed.  However, the court will vacate the Hearing Officer's award of thirty minutes compensatory education for each day that school was in session between February 24, 2010 and the end of the 2010-2011 school year.  The court will instead award full days compensatory education for that time period.

s/Sylvia H. Rambo<br>United States District Judge

Dated:  August 18, 2014.